UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
P.K. and T.K., on behalf of their daughter, S.K.,

Plaintiffs,

-against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

Defendants.
---------------------------------------------------------X

REPORT &
RECOMMENDATION
09-CV-1472 (SJ)

GOLD, S., *United States Magistrate Judge*:

Plaintiffs P.K. and T.K. bring this action on behalf of their daughter, S.K., against the

New York City Department of Education ("Department") under the Individual with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*[1]  Plaintiffs seek review of the administrative

decision that denied their application to have the Department pay for S.K.'s tuition at a private

special education school for the 2008-2009 school year.  In their challenge to that decision,

plaintiffs allege that the Department deprived S.K. of a free and appropriate public education

("FAPE") and violated her substantive and procedural rights under the IDEA.[2]

Defendant and plaintiffs have cross-moved for summary judgment.[3]  The Honorable

---

[1] Many courts have addressed the statutory framework of the IDEA.  *See*, *e.g.*, *M.P.G. v. New York City Dep't of Educ.*, 2010 WL 3398256, at *1-2 (S.D.N.Y. Aug. 27, 2010); *M.S. v. New York City Dep't of Educ.*, 734 F. Supp. 2d 271, 273-74 (E.D.N.Y. 2010).  Accordingly, I assume familiarity with the IDEA and the discussions in these decisions of its statutory scheme. Any discussion of an IDEA claim inevitably involves the use of several acronyms.  Most of those used in this Report are listed for convenience in Appendix A.

[2] FAPE is defined as "special education and related services . . . provided at public expense . . . in conformity with the individualized education program."  20 U.S.C. § 1401(9).

[3] Defendant also moves to strike a supplemental affidavit, Docket Entry 19, that plaintiffs filed on November, 5, 2009.  *See* Docket Entry 30.  In the affidavit, plaintiffs cite the 1988 *Jose P.* consent decree and contend that defendant's violation of the consent decree is a further basis

Sterling Johnson, Jr., has referred the parties' motions to me for report and recommendation. On January 21, 2011, I heard oral argument on the parties' cross-motions and subsequently received supplemental briefing. For the reasons that follow, I respectfully recommend that plaintiffs' motion be granted and that defendant's motion be denied.

### *Facts*

In 2008, S.K. was a four-year-old girl diagnosed with autism, transitioning from preschool to kindergarten at a New York City public school.[4] Compl. ¶ 1. Beginning in October, 2005, when S.K. was two years old, she was evaluated by the Early Intervention Program and began to receive speech therapy. State Review Officer ("SRO") Decision 2, Docket Entry 8-1. S. K. was first diagnosed with autism in May of 2006, and she subsequently began receiving services through the Department of Education's Committee on Preschool Education ("CPSE"), including ten hours of applied behavior analysis ("ABA") services beginning in July, 2006. Impartial Hearing Officer ("IHO") Decision 8; IHO Hrg. Tr. 129.[5]

---

for an award in their favor. As defendant correctly points out, plaintiffs raised this argument for the first time after the motions were fully briefed. Because they never raised the argument during the administrative proceedings, this claim is now barred. *See* 20 U.S.C. §§ 1415(f)(2)(B) (barring evidence at the administrative hearing if not provided to opposing party in advance), 1415(f)(3)(B) (barring a party from raising an issue at the administrative hearing if the issue was not identified in the notice required by § 1415(b)(7)). In any event, an allegation that the *Jose P.* consent decree has been violated should be raised in the *Jose P.* action. *See W.T. & K.T. ex rel. J.T. v. Bd. of Educ. of Sch. Dist. of New York City*, 716 F. Supp. 2d 270, 290 n.15 (S.D.N.Y. 2010) (rejecting plaintiffs' argument of an alleged violation of a consent order and noting that they should "seek relief from the court that entered that order"). Accordingly, I respectfully recommend that defendant's motion to strike be granted.

[4] S.K. is now seven years old. Defendant's Rule 56.1 Statement ("Def. R.56.1") ¶ 1, Docket Entry 22.

[5] The "IHO Hrg. Tr." refers to the transcripts of the hearings conducted on July 24 and September 10, 2008.

The CPSE created S.K.'s final preschool Individualized Education Program ("IEP") on January 28, 2008.[6] The January, 2008 IEP recommended a special 8:1+3 class (8 students for every one teacher plus three paraprofessionals) at her same preschool, plus ten hours per week of home ABA therapy. SRO Decision 7. In addition, the IEP recommended related services, including three thirty-minute 1:1 speech sessions per week and three thirty-minute 1:1 occupational therapy sessions per week. *Id.*

According to a social history completed in January, 2008, S.K. had recently begun working with a new ABA therapist and was making significant progress, particularly with respect to her expressive language skills. SRO Decision 5. Despite her considerable progress, though, according to S.K.'s speech-language pathologist, S.K. still had "significant delays in her receptive and expressive language and in her speech intelligibility." *Id.* at 6. As a result, S.K.'s speech therapist recommended, and her CPSE IEP included, individual 1:1 speech and language therapy three times per week. *Id.*

Two months later, on March 31, 2008, in advance of S.K.'s entrance to kindergarten, S.K.'s mother attended a Committee on Special Education ("CSE") meeting. Def. R.56.1 ¶¶ 5, 7. At or after the meeting, a kindergarten IEP was created for S.K. *Id.* ¶ 5. The IEP recommended a 6:1+1 class (six students for every one teacher and one paraprofessional) in a specialized year-round public school. *Id.* ¶ 8; SRO Decision 8-9. The IEP also recommended that S.K. receive three 1:1 thirty-minute sessions of occupational therapy per week and three 3:1 thirty-minute sessions of speech therapy per week. Def. R.56.1 ¶ 13. The CSE specifically rejected one-on-one

---

[6] An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(14). The IDEA's requirements with respect to the content of IEPs are set forth in 20 U.S.C. § 1414(d).

instruction and did not offer any ABA therapy. *Id*. ¶ 9. The CSE relied on the same provider reports as used by the CPSE, with the addition of a report obtained by plaintiffs from the McCarton Center. As noted above, these reports indicated that S.K. continued to have significant speech delays, but had made substantial progress recently with the help of her new ABA therapist.

On May 12, 2008, plaintiffs filed a request for a due process hearing to challenge the IEP. Def. R.56.1 ¶ 21; Compl. ¶ 11 and Ex. C. In their due process demand letter, plaintiffs raised both procedural and substantive challenges to the IEP. Plaintiffs contended, among other things, that the IEP was deficient because the Department failed to conduct and develop a behavior plan, failed to identify clear goals, failed to indicate the number of progress reports that would be prepared, failed to comply with New York regulations for students diagnosed with autism that require a specified amount of speech therapy and that parent training be provided, and generally failed to offer S.K. a FAPE. *Id*.

On June 11, 2008, the Department sent plaintiffs a Final Notice of Recommendation, offering S.K. placement at P.S. 151 in a full-year special education 6:1+1 class for the 2008-2009 school year. *Id*. ¶ 22. Having previously visited P.S. 151 and finding it did not appropriately meet their daughter's needs, plaintiffs sent a letter to the Department rejecting its offer to place S.K. there. IHO Decision 10. During this process, plaintiffs investigated alternative placement options for S.K. and ultimately decided that Manhattan Children's Center ("MCC"), a special education school for children with autism, was an appropriate school for their daughter. IHO Decision 7, 10. For the 2008-2009 school year, S.K. attended MCC and received ten hours of home ABA therapy, as required by the IDEA's pendency placement provision, 20 U.S.C. § 1415(j).

4

Impartial hearings were held pursuant to the IDEA, 20 U.S.C. § 1415(f), in July and September of 2008. IHO Decision 2. After hearing three days of evidence, the impartial hearing officer ("IHO") concluded that S.K.'s IEP was deficient in the following respects: 1) the Department failed to develop a Functional Behavioral Assessment ("FBA") and Behavioral Intervention Plan ("BIP") to address S.K.'s interfering behaviors, 2) the IEP did not comply with 8 N.Y.C.R.R. § 200.13 because it failed to provide sufficient speech therapy and did not offer any parent counseling and training, and 3) the Department failed to set forth any methods for measuring S.K.'s progress in meeting her goals. IHO Decision 22. The IHO then found that S.K.'s parents had established that their proposed placement, MCC, was appropriate. *Id*. at 22-23. Finally, the IHO concluded that the balance of equities favored the parents and ordered the Department to pay S.K.'s tuition at MCC. *Id*. at 23-24.

The Department appealed the IHO's decision to a State Review Officer ("SRO") as provided by New York law. N.Y. EDUC. LAW § 4404(c). The SRO reversed the IHO's decision, finding upon review of the record that 1) there was no need for a FBA or BIP, 2) the Department's proposed school placement would have met the speech therapy and parent services requirements of 8 N.Y.C.R.R. § 200.13, and 3) although cautioning the Department "to ensure its compliance" with the IDEA's requirements concerning measuring progress toward goals, any deficiency in S.K.'s IEP in this respect did not deny her a FAPE. SRO Decision 14-19. The instant action is plaintiffs' appeal from the January 21, 2009 SRO decision.[7] Compl. ¶ 15.

---

[7] In their memoranda, plaintiffs argue extensively that the SRO has a record of bias and partiality and that his decision is therefore not entitled to deference. Plaintiffs focus in particular on the SRO's alleged personal relationship with an attorney who has represented the State Education Department in litigation concerning a municipality's duty to pay for private school tuition under the IDEA. Pl. Mem. 1-11, Docket Entry 9; Pl. Reply 2-3, 8-10, Docket Entry 17.

*Discussion*

*Standard of Review Applicable to Administrative Decisions*

In an IDEA case, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions." *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted). Unlike the question raised by a traditional summary judgment motion, however, the inquiry a court undertakes in an IDEA case "is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *S.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 352 n.1 (S.D.N.Y. 2009) (internal quotation marks omitted). A district court conducts a modified *de novo* review of the administrative proceedings, basing its decision "on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C)(iii). *See also T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("Though the court must show deference to administrative board findings, the court is also empowered to conduct an independent review of the record as a whole and even hear additional evidence.").

A court reviewing a state educational decision under the IDEA has a "circumscribed" role. *T.P.*, 554 F.3d at 252. The Supreme Court has cautioned district courts not to "substitute their own notions of sound educational policy for those of the school authorities which they review."

_____

Other courts have rejected this argument as without merit or relevance. *See M.S.*, 734 F. Supp. 2d at 279 (rejecting an argument made by plaintiffs' counsel here of bias on the part of the SRO); *W.T. & K.T.*, 716 F. Supp. 2d at 283-86 (rejecting arguments of bias by SRO based on his relationship with a lawyer for the State Education Department and on a statistical proffer). I do as well.

*Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). Rather, a reviewing court "must give due weight to [the administrative] proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.P.*, 554 F.3d at 252 (quoting *Rowley*, 458 U.S. at 208) (internal quotation marks omitted). "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy," *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 195 (2d Cir. 2005), and "when . . . the state hearing officers' review has been thorough and careful." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). Nonetheless, "federal courts do not simply rubber stamp administrative decisions." *Id.*

Where, as here, "the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.'" *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). Thus, a reviewing court should "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* (internal quotation marks omitted); *see also Karl by Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984) (holding that federal courts are required to "defer to the final decision of the state authorities, and that deference may be not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer").

*Standard for Awarding Tuition Reimbursement: The Burlington-Carter Test*

To receive reimbursement for a private school placement, parents must satisfy what is known as the "Burlington-Carter" test, a standard established by the Supreme Court. *M.P.G. ex*

*rel. J.P. v. New York City Dep't of Educ.*, 2010 WL 3398256, at *2 (S.D.N.Y. Aug. 27, 2010)

(citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985) and *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993)). Under this well-settled test,

> [a] board of education may be required to pay for the educational
> program selected by a parent only if (1) the educational program
> recommended by the board of education was inadequate or
> inappropriate; (2) the program selected by the parent was
> appropriate, such that the private program meets the student's
> special education needs; and (3) the equities support the parent's
> claim.

*Id*. In addressing the first prong of the test, a court considers whether the student's IEP was developed according to the procedural and substantive requirements of the IDEA. *Id.* If a court determines that there has been no procedural or substantive violation of the IDEA, it need not consider the remaining two prongs of the Burlington-Carter test. *Id.* at *2; *see also T.Y.*, 584 F.3d at 417; *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000).

   *A. Prong One of the Burlington-Carter Test*

   The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. *See also* 20 U.S.C. § 1401(29) (defining special education as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability"); *Rowley*, 458 U.S. at 181 (noting that the "'free appropriate public education' required by the Act [must be] tailored to the unique needs of the handicapped child"); *T.Y.*, 584 F.3d at 417; *Cerra*, 427 F.3d at 192. When assessing whether an IEP satisfies the IDEA's mandates, "a federal court must examine the record for any 'objective evidence' that the student's IEP will afford more than 'trivial advancement' and is 'likely to produce progress, not

regression.'" *M.M. v. New York City Dep't of Educ.*, 583 F. Supp. 2d 498, 507 (S.D.N.Y. 2008)

(quoting *Walczak*, 142 F.3d at 130); *see also T.P.*, 554 F.3d at 254; *Cerra*, 427 F.3d at 195.

> IDEA does not itself articulate any specific level of educational benefits
> that must be provided through an IEP.  The Supreme Court, however, has
> specifically rejected the contention that the 'appropriate education'
> mandated by IDEA requires states to 'maximize the potential of
> handicapped children.'

*Walczak,* 142 F.3d at 130 (quoting *Rowley*, 458 U.S. at 197 n. 21).  "What the statute guarantees

is an 'appropriate' education, not one that provides everything that might be thought desirable by

loving parents."  *Id.* at 132 (internal quotation marks omitted).

A reviewing court considers whether the challenged IEP was developed according to the

procedures required by the IDEA as well as whether it meets the IDEA's substantive requirement

that it be reasonably calculated to confer an educational benefit addressed to the unique needs of

the student.  *M.P.G.*, 2010 WL 3398256, at *2.  A procedural violation generally concerns the

process by which the IEP and placement offer was developed and conveyed; on the other hand, a

substantive violation arises from a deficiency in the programming being offered.  *A.K. ex rel J.K.*

*v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 n.7 (4th Cir. 2007).  *See also Rowley*, 458 U.S. at

205 (suggesting that procedural requirements focus on "full participation of concerned parties

throughout the development of the IEP").  Even when a procedural violation has occurred, a

student has been denied a FAPE under the IDEA

> only if the procedural inadequacies--
> (I) impeded the child's right to a free appropriate public education;
> (II) significantly impeded the parents' opportunity to participate in
> the decisionmaking process regarding the provision of a free
> appropriate public education to the parents' child; or
> (III) caused a deprivation of educational benefits.

20 U.S.C.A. § 1415(f)(3)(E)(ii).

Plaintiffs, while not specifically identifying their various claims as either procedural or substantive, contend that S.K. was denied a FAPE and the IDEA was violated because: 1) defendant failed to conduct a FBA or develop a BIP, 2) defendant failed to identify methods of measuring S.K.'s progress in reaching her goals, and 3) defendant failed to provide adequate speech therapy and parent training and counseling as required by 8 N.Y.C.R.R. § 200.13. Pl. Mem. 19; Pl. Reply 4-5. I conclude that the first claimed violation raises a procedural concern, *see A.C.*, 553 F.3d at 172 (addressing a claimed failure to conduct a FBA as a procedural violation); *M.H. v. New York City Dep't of Educ.*, 712 F. Supp. 2d 125, 158 (S.D.N.Y. 2010) (same), while the second and third allege substantive violations, *see T.Y.*, 584 F.3d at 419 (reviewing claims that school board failed to offer necessary parent training or speech therapy as substantive violations); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003) (noting that it is not clear whether "inadequate articulation of objectives" on an IEP raises a substantive or procedural concern). *But see M.M.*, 583 F. Supp. at 507, 510 (deeming a failure to conduct a FBA to be a substantive violation); *Danielle G. v. New York City Dep't of Educ.*, 2008 WL 3286579, at *10 (E.D.N.Y. Aug. 7, 2008) (same); *R.R. ex rel M.R. v. Scarsdale Union Free Sch. Dist.*, 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009) (suggesting that any deficiencies with respect to an IEP's articulation of goals are procedural violations that must result in substantive harm to be actionable).

### 1. *Failure to conduct a FBA and to develop a BIP*

Plaintiffs contend that the Department's failure to conduct a functional behavioral

assessment ("FBA") and to develop a behavioral intervention plan ("BIP") denied S.K. a FAPE.[8]

Under New York law, the CSE must conduct a FBA "for a student whose behavior impedes his or

her learning or that of others, as necessary to ascertain the physical, mental, behavioral and

emotional factors which contribute to the suspected disabilities."  8 N.Y.C.R.R. § 200.4(b)(1)(v).

However, a FBA is not explicitly required under the IDEA; the IDEA mandates simply that the

CSE "consider the use of positive behavioral interventions and supports, and other strategies," to

address a student's behavior that "impedes the child's learning or that of others."  20 U.S.C.

§ 1414(d)(3)(B)(I); *see also* 34 C.F.R. § 300.324(a)(2)(i).  Accordingly, courts have found that,

"[i]f the DOE fulfilled the IDEA procedural requirements [with respect to students whose

behaviors impede their learning], a failure to conduct a FBA, even if the FBA was required under

---

[8] New York defines a functional behavioral assessment ("FBA") as a
process of determining why the student engages in behaviors that
impede learning and how the student's behavior relates to the
environment.  The functional behavioral assessment . . . shall
include, but is not limited to, the identification of the problem
behavior, the definition of the behavior in concrete terms, the
identification of the contextual factors that contribute to the
behavior (including cognitive and affective factors) and the
formulation of a hypothesis regarding the general conditions under
which a behavior usually occurs and probable consequences that
serve to maintain it.

8 N.Y.C.R.R. § 200.1(r).  A behavioral intervention plan is defined as "a plan that is based on the
results of a functional behavioral assessment and, at a minimum, includes a description of the
problem behavior, global and specific hypotheses as to why the problem behavior occurs and
intervention strategies that include positive behavioral supports and services to address the
behavior."  *Id*. § 200.1(mmm).  Under New York law, the CSE "shall consider" the development
of a BIP, and conduct an antecedent FBA, in four situations: when 1) a "student exhibits
persistent behaviors that impede his or her learning or that of others, despite consistently
implemented . . . interventions;" 2) a "student's behavior places the student or others at risk of
harm or injury;" 3) the CSE is considering a more restrictive program for the student because of
the student's behavior; and 4) the student is subject to discipline for conduct that was a
"manifestation of the student's disability."  *Id*. § 200.22(b)(1).

New York law, will not constitute a denial of a free appropriate public education." *Connor ex rel. I.C. v. New York City Dep't of Educ.*, 2009 WL 3335760, at *4 (Oct. 13, 2009) (citing *A.C.*, 553 F.3d at 172); *see also T.Y.*, 584 F.3d at 419; *A.C.*, 553 F.3d at 172 (reversing district court and finding that any failure to conduct a FBA did not deny the student a FAPE); *M.H.*, 712 F. Supp. 2d. at 158 (stating that a "[f]ailure to conduct an FBA does not amount to a procedural violation of the IDEA where the IEP sets forth other means to address the student's problematic behaviors"); *M.N. v. New York City Dep't of Educ., Region 9 (Dist. 2)*, 700 F. Supp. 2d 356, 366 (S.D.N.Y. 2010) (same).

On S.K.'s IEP, the CSE checked a box that indicates that her "[b]ehavior does not seriously interfere with instruction and can be addressed by the . . . special education teacher." IEP 4. In his decision, the IHO found that the Department should have conducted a FBA and developed an appropriate BIP in light of S.K.'s interfering behaviors. IHO Decision 22. The IHO apparently credited the ABA provider's report that S.K. has interfering behaviors, including echolalia, temper tantrums, and nail-biting, as well as the testimony of S.K.'s mother that S.K. sometimes exhibits aggressive behaviors, including pinching. IHO Decision 5, 9. The IHO cited the Department's failure to conduct a FBA and develop a BIP, among other things, in concluding that S.K.'s parents satisfied the first step of the Burlington-Carter test. IHO Decision 22.

In rejecting the IHO's decision, the SRO concluded that "there is no persuasive evidence in the hearing record that the student demonstrated a need for either an FBA or a BIP at the time of the March 31, 2008 CSE meeting." SRO Decision 15. The SRO relied on a social history update in which S.K.'s mother indicated that S.K.'s aggressive behaviors had diminished and were "now all but nonexistent." *Id*. S.K.'s preschool special education teacher also noted that

S.K.'s interfering behaviors were decreasing, and her speech therapist reported that, when her attention waned, S.K "responded to prompting and redirection to remain engaged and to complete tasks."  *Id.*  The SRO cited the testimony of Ms. Finkelstein, a CSE psychologist supervisor, who stated that S.K. did not require a FBA because

> strategies that were utilized by her current providers seemed to be moving her towards the right direction.  It wasn't as though we really had to look at antecedents that were creating certain behaviors and try to figure out how to ameliorate them . . .  because it seemed from the report that [S.K.] was already starting to be motivated with her tasks.

*Id.* (citing IHO Hrg. Tr. 345-46).  The SRO thus concluded that the record demonstrated "that the student was successfully responding to interventions in the classroom, and to the extent that she had been exhibiting interfering behaviors, by parent report, such behaviors had decreased. Additionally, . . . the student's teacher . . .  would have adequately addressed any behavioral difficulties exhibited by the student if they occurred."  *Id.* at 16.

Courts finding a violation of the IDEA based upon a failure to conduct a FBA have done so where, unlike here, there was no evidence that the student's interfering behaviors were being adequately managed.  *See R.K. v. New York City Dep't of Educ.*, 09-CV-4478, at *39-44, 55-56 (Report & Recommendation, Docket Entry 59) (E.D.N.Y. Jan. 21, 2011) (overturning the SRO's conclusion that a FBA was not required because the SRO's decision was based on testimony that the student's interfering behaviors were "not unusual," whereas "the proper inquiry in determining the necessity of an FBA is whether the behavior impedes learning, not whether the behavior is atypical"); *Danielle G.*, 2008 WL 3286579, at *11 (concluding that a FBA was required where the student's evaluator testified that the student "engages in self-stimulatory activity and is hyper-

active" and the special education teacher described her as "inconsistent and erratic" and "engag[ing] in finger play during class until the point where she's bleeding").

Here, in contrast, the SRO's conclusion that a FBA was not required was supported by the consistent reports of S.K.'s mother, special education teacher and speech therapist that S.K.'s interfering behaviors were diminished and well under control. The facts in this case are, therefore, more analogous to those in which a FBA was held not to be required. *See A.C.*, 553 F. 3d at 172 (finding that the evidence supported the SRO's conclusion that the IEP adequately addressed the student's interfering behaviors, especially when giving deference to the administrative officers' factual findings, and emphasizing that "the sufficiency of [the school district's] strategies for dealing with this behavior is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers") (internal quotation marks omitted); *M.M.*, 583 F. Supp. 2d at 510 (finding no denial of a FAPE and no violation of the IDEA for failing to conduct a FBA where the record indicated that the student's interfering behaviors could be addressed "with refocusing and redirection" and noting that the SRO found a FBA would have been premature as the autistic student had not yet attended the recommended placement); *Perricelli v. Carmel Cent. Sch. Dist.*, 2007 WL 465211, at *13 (S.D.N.Y. Feb. 9, 2007) (deferring to the SRO's determination that a FBA was not required because the student's teachers reported that the student's discipline problems were "workable" and not "too much to handle"). I therefore afford the SRO's conclusions deference and conclude as well that the Department was not required by the IDEA to conduct a FBA or to develop a BIP for S.K.

> 2.   *IEP's Failure to Identify Methods for Measuring S.K.'s Progress*

The IDEA requires that an IEP include "a statement of measurable annual goals . . . [and]

14

a description of how the child's progress toward meeting the annual goals . . . will be measured and when periodic reports on the progress the child is making . . . will be provided."  20 U.S.C. § 1414(d)(1)(A)(i)(II-III).  Plaintiffs contend that the IEP denied S.K. a FAPE because it failed to identify methods for measuring her progress toward meeting her goals.  Pl. Mem. 19.  On S.K.'s IEP, only one of the twenty objectives listed includes a method of measurement: S.K. "will initiate interaction with others during speech class with increasing frequency *as measured by* theacher [sic] observation." (emphasis added).

The IHO determined that the Department "failed to establish that the methodology they utilize accurately measures whether or not the child has achieved or is progressing in reaching her goals."  IHO Decision 22.  In his decision, the SRO acknowledged that the IEP failed to include "a specific method of measurement of the student's progress" or an indication of "how many progress reports would be issued each year."  SRO Decision 18.  Indeed, at the top of the IEP pages listing goals and objectives is a line: "There will be ___ report(s) of progress per year."  On S.K.'s IEP, the blanks are empty.  The SRO nevertheless concluded that the evidence did not demonstrate that these deficiencies "impeded the student's right to a FAPE."  SRO Decision 19. The SRO appears to have based his decision, at least in part, on testimony provided by the teacher of the class recommended for S.K. by the Department.  As summarized by the SRO, this teacher "stated that 'during the one to one sessions we do have our data feed where we record the data according to the different goals and at the same time we do have our data sheets' . . . .  She further indicated that data was collected throughout the day."  SRO Decision 18.  The SRO also relied on the teacher's statements that "she 'always does a lot of informal assessments' and that 'observation is one of the most effective' forms of measurement."  *Id*. at 19.  In addition, the

teacher described her practice of using individual notebooks to record observations of a student performing a new task, evaluating language and learning skills of students by using a particular assessment tool, and developing her own checklists. *Id.* Finally, the SRO concluded that "information regarding the student's progress would have been readily available to the parents." *Id*. at 18.

Courts have been reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress. Rather, "[t]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382. At least one has court concluded that even the complete absence of any goals did not result in a denial of a FAPE. *G.N. v. Bd. of Educ.*, 2007 WL 2265035, at *7-8 (D.N.J. Aug. 6, 2007). *See also Z.D. v. Niskayuna Cent. Sch. Dist.*, 2009 WL 1748794, at *3 (N.D.N.Y. June 19, 2009) (finding that parents failed to demonstrate that any alleged deficiencies with respect to goals resulted in a denial of FAPE); *Stanley & Connie C. v. M.S.D. of Sw. Allen County Sch.*, 628 F. Supp. 2d 902, 961-62 (N.D. Ind. 2008) (noting that "a failure to include measurable goals, like other procedural defects, does not amount to a denial of a FAPE unless it also significantly impedes the parents' opportunity to participate in decision making regarding the provision of a FAPE, impedes the student's right to a FAPE, *or* causes a deprivation of educational benefits to the student" and finding no denial of a FAPE); *but see M.H.*, 712 F. Supp. 2d at 156-57 (finding an IDEA violation where the IEP failed to include evaluative procedures for the majority of the objectives).

Here, the SRO relied on specific evidence in the record that S.K. would not be deprived of educational benefits due to the failure of her IEP to include methods of measuring her progress.

As the SRO noted, S.K.'s proposed teacher testified that she would take a variety of steps to measure S.K.'s progress and would document her observations in an individual notebook. SRO Decision 19. I therefore defer to the SRO's conclusion that any alleged deficiency with respect to S.K.'s goals did not rise to the level of a denial of a FAPE. *See W.T. & K.T.*, 716 F. Supp. 2d at 288-89 (deferring to the SRO's finding that a failure to identify measurement methods did not result in a denial of a FAPE where the evidence indicated the student's teacher would assess the student's progress over the course of the school year).

### 3. *Related Services*

The IDEA requires that an IEP include a statement of the "related services" to be provided to a student or on the student's behalf. 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Speech therapy and parent counseling and training are among the types of related services that a student might require in order to make progress. 20 U.S.C. §§ 1401(26)(A) (defining related services to include speech therapy); 34 C.F.R. § 300.34(a) (defining related services to include parent counseling and training). New York regulations in effect at the time S.K.'s IEP was prepared called for students with autism to receive a minimum level of speech therapy and for their parents to receive training and counseling. 8 N.Y.C.R.R. §§ 200.13(a)(4), (d) (pre-Dec. 8, 2010 regulation).[9] Plaintiffs

---

[9] Prior to December 8, 2010, the regulation governing speech therapy required that instructional services "be provided to meet the individual language needs of a student with autism for a minimum of 30 minutes daily in groups not to exceed two, or 60 minutes daily in groups not to exceed six." 8 N.Y.C.R.R. § 200.13(a)(4). The regulation now simply states that the "functioning levels of students with autism . . . shall govern their individual or small group instruction" and that instructional services "shall be provided to meet the individual language needs of a student with autism." *Id.* §§ 200.13(a), (a)(4).

The section of the regulation concerned with parent training and counseling states that "[p]rovision shall be made for parent counseling and training . . . for the purpose of enabling parents to perform appropriate follow-up intervention activities at home." *Id.* § 200.13(d). The regulations define parent counseling and training as "assisting parents in understanding the

contend that S.K.'s IEP failed to meet the requirements of Section 200.13 because it did not provide for the amount of individual speech therapy called for in the regulation and did not provide for any parent counseling and training at all. As a result, and because S.K. could not be expected to make progress without these services, plaintiffs argue that the IEP denied S.K. a FAPE.

The IHO found that the Department failed to provide the speech therapy and parent training required by 8 N.Y.C.R.R. § 200.13. IHO Decision 19-20. Based upon this finding, among other things, the IHO concluded that S.K.'s IEP failed to offer her a FAPE. IHO Decision 18, 22.

In his decision, the SRO acknowledged that the governing state regulations provided that a student with autism should receive speech therapy for a minimum of thirty minutes each day individually or with only one other student, or for sixty minutes each day in groups of six or less. SRO Decision 16. The IEP prepared for S.K., though, called for three thirty-minute sessions per week in a group of three. The SRO found this adequate based upon testimony from S.K.'s proposed special education teacher that she provides specialized language instruction in her classroom throughout the day; as described by the SRO, the teacher testified that "specialized language instruction takes place 'all throughout the day because communication is all throughout the day.'" *Id.* The SRO also relied on the view expressed by the Department's supervisor of psychologists that, when students are pulled out of classroom settings for specialized services,

---

special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program." *Id*. § 200.1(kk). *See also* 34 C.F.R. § 300.34(c)(8)(i) (defining parent counseling and training similarly).

they lose an opportunity to interact with fellow students and enhance their social and communication skills. *Id.* at 17. For these reasons, the SRO concluded that, "although not specifically delineated on the student's IEP, as a whole, the hearing record reflects that the student's program, including specific speech-language therapy and in-class language instruction, were [sic] appropriate to meet the student's individual speech-language and communication needs." *Id.*

With respect to parent training, the SRO relied on testimony of the defendant's psychology supervisor that S.K.'s recommended school placement "did a great deal to support parents," including offering a six-week parent training program provided by a non-profit agency, monthly meetings, and support groups. SRO Decision 17. The SRO concluded that "although parent counseling and training was not specifically set forth in the March 31, 2008 IEP, in light of the evidence presented herein regarding the available services for parent counseling and training at the proposed placement, the district's failure to include these services on the IEP did not procedurally or substantively[] result in the denial of a FAPE to the student." *Id.* at 18.

In addition to its failure to provide 1:1 speech therapy or parent counseling and training, S.K.'s IEP made no provision for 1:1 ABA therapy. Indeed, the only 1:1 service identified in the IEP consisted of three thirty-minute occupational therapy sessions each week. At the time the IEP was prepared, though, S.K. was receiving 1:1 speech therapy for thirty minutes three times per week, 1:1 occupational therapy for thirty minutes three times per week, and ten hours per week of 1:1 ABA therapy. With these support services, S.K. was making significant progress. According to her parents, S.K. had experienced a "vocabulary explosion since last July when a new therapist began doing ABA" with her. *See* Perlov Social History Update. S.K.'s parents also reported that

S.K. "is always smiling and making eye contact and is a happy child who is not as withdrawn as she was initially prior to all the intervention she has received." *Id.* Moreover, as discussed above in connection with the failure of the IEP to provide for a FBA or BIP, S.K.'s mother and preschool teacher had noted that S.K.'s interfering behaviors had significantly diminished.

Having reviewed the record, I conclude that the evidence demonstrates that S.K. required substantial related services and greater individualized attention in order to make meaningful progress and receive an educational benefit from her schooling. S.K.'s IEP, by calling upon her to attend a new school where she would be working under a new teaching staff and with new classmates, while at the same time eliminating her 1:1 speech therapy, terminating her 1:1 home ABA therapy and failing to provide training and counseling to her parents, was likely to lead to regression rather than produce progress. *Cf. M.M.*, 583 F. Supp. 2d at 507. The IEP therefore deprived S.K. of her right to a FAPE.

In his decision rejecting plaintiffs' challenge to S.K.'s IEP, the SRO pointed to no evidence indicating that S.K. no longer needed individualized speech and ABA therapy. For example, other than the IEP itself, no report of any expert suggested that S.K. would continue to make meaningful progress even if her home ABA therapy and 1:1 speech therapy sessions were eliminated. Nor did the SRO cite to any studies or expert testimony in the record indicating that autistic children generally benefit from such services only for a limited period of time, or that they are able to make progress without continued one-on-one support if they show progress after a brief period.

To the contrary, the evidence in the record strongly indicates that S.K. had substantial deficits and continued to require individualized therapy to make progress. The record included

several reports prepared by experts who worked with or evaluated S.K. strongly suggesting that S.K. required continued one-on-one support.  For example, Annette Rhoomes, S.K.'s ABA therapist, noted that S.K. was "making rapid and consistent progress" in the few months she had been working with S.K, IHO Hrg Ex. 6 at 1, but required continued home ABA therapy "to generalize her skills across different settings with different providers."  IHO Hrg. Tr. 75.  Ms. Rhoomes also noted that S.K. still "does a lot of echolalia . . . she's not available to learn at that time. . . .  And sometimes she will hit or have little temper tantrums."  *Id.* at 85.  According to Rhoomes, to address these behaviors,

> [S.K.] needs one on one teaching.  She does need applied behavior analysis, I believe, because it helps her . . . when she engages in [interfering] behaviors, . . . when you teach her to be able to work and not do some of these behaviors while working, and being engaged and being focused, it helps her to just focus more.  I–you're able to prevent some of it from happening before it happens.  You can redirect more when it's one on one. . . .  You can use physical prompting, or you can use gestures for her to kind of be quiet. . . . [S]he will understand better in a one on one setting.

*Id*. at 86-87.

A second relevant report was written by the speech therapist who worked with S.K. at her preschool.  The report was prepared in January of 2008, about two months before the Department prepared S.K.'s kindergarten IEP.  While noting that S.K. had made substantial progress, the speech therapist also described "significant delays in her receptive language, expressive language and speech intelligibility."  IHO Hrg. Ex. 9 at 3.  The therapist concluded that S.K. continued to require one-on-one assistance: "[S.K.] would continue to benefit from speech and language intervention 3 times weekly in a 1:1 ratio with the final determination made at the review."  *Id.*

Finally, the record includes an evaluation prepared by the McCarton Center, a private

provider retained by S.K.'s parents. The McCarton Center report was written based upon testing and observations of S.K. conducted in February 2008, the month before the IEP was prepared. The report, like the one prepared by her preschool speech therapist, describes S.K.'s verbal skills as "significantly delayed in all areas, including vocabulary, reasoning, knowledge of concepts and short-term auditory memory. IHO Hrg. Ex. 5 at 7. Based on clinical observations and test results, the McCarton Center recommended *increased* individual speech therapy and continued home ABA therapy:

> [S.K.] should attend an ABA based school where she can receive 1:1 instructions. Her skills are still systematically delayed and she responds best to 1:1 instructions. [S.K. should] [c]ontinue . . . ABA therapy for 10 hours a week at home with the current instructor. [S.K.] responds very well to this therapist and intervention would be interrupted with the introduction of a new therapist. [S.K.'s] parents should have an additional two hours a week with the ABA supervisor so they can learn the techniques necessary to generalize what she is learning in 1:1 ABA to the home and community setting. . . . Speech/language therapy 5x60 minutes weekly (1:1). These sessions should . . . focus on all aspects of expressive and receptive language skills.

*Id.* at 7-8.

The consistent recommendations of S.K.'s ABA therapist, her speech therapist, and the McCarton Center stand in sharp contrast to the lack of any expert opinion supporting the SRO's conclusion that, despite its lack of 1:1 speech therapy, ABA therapy or parent training and counseling, the IEP did not deprive S.K. of a FAPE. Even the Department's witness – Ms. Finkelstein, supervisor of psychologists for the Department's Committee on Special Education – acknowledged that S.K. was still substantially delayed at the time the IEP was prepared and that

there was a strong basis for continuing S.K.'s 1:1 speech therapy.[10]  IHO Hrg. Tr. 341, 374.

The record similarly indicates that parent training and counseling would have been important to S.K.'s ability to progress.  As noted above, the SRO reached his decision in part based upon the services available to parents at the school recommended for S.K. by the Department.  It seems that these services would have focused on issues of general concern to parents of children with special needs and would not have been specifically tailored to S.K.'s needs and educational program.  The evidence indicates, however, that it is important for the parents of a student with autism to reinforce the specific teaching methods used by the student's service providers.  A report submitted by Annette Rhoomes, S.K.'s ABA therapist, concludes that S.K.'s parents "are more than helpful in collaborating with [S.K.]'s teachers[] and therapists and replicate teaching methods that are used with teaching [S.K.] I think that that also contributes greatly to [S.K.]'s success."  IHO Hrg. Ex. 6 at 4.

For the reasons stated above, I conclude that terminating S.K.'s 1:1 speech and ABA therapy and failing to provide training to her parents, taken in combination, deprived S.K. of a FAPE.  Moreover, I find the arguments mustered by the SRO in support of his decision and those

---

[10] At the IHO hearing, S.K.'s mother testified that she was under the impression that S.K. would receive individual speech therapy three times per week, that there was no discussion about group speech therapy, and that it was only when she received the IEP in the mail that she discovered S.K. was offered group therapy.  IHO Hrg. Tr. 412.

With respect to the ABA therapy, Ms. Finkelstein testified that the CSE did not consider offering S.K. home ABA therapy because they wanted to wait and see how she did in school.  IHO Hrg. Tr. 353 ("At the time of the CSE review we do not make recommendations for after until we see what is accomplished during the course of the school day and what is available to . . . respond to these during the course of the school day.").  She also noted that "many, many children do very well with [ABA], and this should be part of their day."  *Id*.  S.K.'s mother, however, testified that the CSE refused to discuss home ABA therapy and that she was told that the Department does not provide home ABA therapy for children over the age of five.  *Id*. at 168, 414-15.

advanced by the Department in this litigation to be unpersuasive. For example, it seems that one of the reasons the SRO concluded it was appropriate not to provide S.K. with individualized speech therapy is that pulling a student out of a classroom deprives the student of the opportunity to interact with other students. However, the IEP *does* provide for S.K. to receive speech therapy outside of the classroom, but in groups of three rather than one or two. The SRO also apparently relied upon the testimony of the special education teacher at the school recommended for S.K. that specialized language instruction takes place throughout the day because communication takes place all day. This generalized approach is, simply put, not a meaningful substitute for the focused, individualized attention and instruction determined by the experts cited above to be necessary for S.K.'s continued development.

Ms. Finkelstein, the Department's witness, attempted to justify the decision to discontinue S.K.'s 1:1 speech therapy by pointing our that plaintiffs "could always get more services if necessary." IHO Hrg. Tr. 374. This is hardly a compelling rationale for denying necessary services for two reasons. First, it is not clear what showing would suffice to secure additional services if the McCarton Center report and the recommendation of S.K.'s preschool speech therapist were insufficient. Furthermore, plaintiffs – who apparently felt they had already demonstrated that additional services were necessary – were put in the position of evaluating the IEP and recommended placement without any assurance that 1:1 speech therapy would ever be provided.

In its supplemental letter, the Department argues that it is not required to "offer a student a service one year simply because it benefitted the child in a previous year;" and that an IEP must be "based on [a student's] current educational needs." Docket Entry 40 at 3-4. I do not base my

conclusion that S.K. required individualized speech and ABA therapy on the mere fact that S.K. was receiving 1:1 speech therapy and home ABA therapy at the time her IEP was prepared. Rather, I base my decision on the significant progress S.K. was just beginning to make with those support services in place, the consistent expert opinions in the record that S.K. required continued individualized speech and ABA therapy to maintain her progress, and the absence of any evidence in the record suggesting that S.K. would receive a non-trivial educational benefit without these support services.[11]

Finally, the Department argues that I may not consider the failure of the IEP to provide for home ABA therapy because plaintiffs did not raise this alleged deficiency at the administrative level. Oral Arg. Tr. 25-26, Docket Entry 34; *see also* Def. Supp. Letter, Docket Entry 40, at 2-3; 20 U.S.C. § 1415(f)(3)(B) ("The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . ., unless the other party agrees otherwise."). I reject this argument for two reasons. First, in reaching my decision that S.K. was denied a FAPE, I do not rely exclusively on the IEP's failure to provide for 1:1 ABA therapy. Rather, I consider whether the IEP "as a whole" provided sufficient services to enable S.K. to make progress. *T.Y.*, 584 F.3d at 419; *R.K.*, 09-Civ-4478, Docket Entry 59 at *48. In this case, I reach my conclusion based upon the combined impact of the simultaneous termination of S.K.'s 1:1 speech therapy and 1:1 ABA therapy, as well as the lack of parent counseling and training focused specifically on S.K.'s needs, all while S.K. was being asked to make a transition to a new kindergarten class at a new school. Second, while S.K.'s parents did not explicitly

---

[11] Moreover, the CSE relied on the exact same service provider reports (with the addition of the McCarton Center Report) as the CPSE did, but the CSE failed to explain why S.K. needed less services as she transitioned to kindergarten.

identify a lack of home ABA therapy as among the IDEA violations itemized in their due process demand letter, they did suggest in their letter that the list was not exhaustive and specifically requested that S.K.'s home ABA therapy be continued.  5/12/08 Demand for Due Process Letter, Compl. Ex. C, 3 ("At the hearing, *among other deficits and violations*, we will establish the following as part of [the] Prong I presentation . . . .") (emphasis added); *id*. at 5 (proposing that S.K. attend MCC and receive home-based ABA).  Other references to home ABA therapy in the administrative record likewise afforded notice to the Department of plaintiffs' claim that S.K. required continued home ABA therapy.  *See* 6/20/08 Letter from plaintiffs to the CSE Chairperson (stating that "any services short of Dr. [Mc]Carton's recommendations[, which included ten hours of home ABA therapy,] are inappropriate"); IHO Hrg. Tr. 405-06 (testimony of Ms. Finkelstein acknowledging that S.K.'s parents expressed great concern at the IEP meeting about continuing S.K.'s home ABA therapy).

The contrast between S.K.'s IEP and the one considered by the Second Circuit in *T.P.* is instructive here.  The Court in *T.P.* considered an IEP that, like S.K.'s IEP, terminated home ABA therapy at the same time the student was beginning kindergarten.  554 F.3d at 254.  Although the Court in *T.P.* did not find a denial of FAPE, unlike here, both "the SRO and IHO found[] the IEP included numerous supports and services to assist  S.P. [the student] with his transition[,] includ[ing] 10 hours of in-school ABA."  *Id*.  Indeed, it is not uncommon for the IEP of a child with autism to include continued ABA therapy, whether at home or in school, to ensure that the student continues to progress in her education.  *See*, *e.g.*, *id.* (finding ten hours of in-school ABA appropriate); *M.H.*, 712 F. Supp. 2d at 162-63; *C.B. v. New York City Dep't of Educ.*, 2005 WL 1388964, at *23 (E.D.N.Y. June 10, 2005) (finding that the record demonstrated that home ABA

26

therapy was an important component of the student's education); *but see Student X v. New York City Dep't of Educ.*, 2008 WL 4890440, at *17 (E.D.N.Y. Oct. 30, 2008) (affirming the decisions of the SRO and IHO that denial of home ABA was not a denial of a FAPE).

For all these reasons, I find that S.K.'s IEP was not "reasonably calculated to enable [S.K.] to receive educational benefits," *Rowley*, 458 U.S. at 207, and was not "tailored" to S.K.'s "unique needs," *id*. at 181. S.K. was denied a FAPE because the IEP failed to provide for "personalized instruction with sufficient support services to permit [S.K.] to benefit educationally from that instruction." *Id*. at 203. I therefore turn my attention to prongs two and three of the Burlington-Carter test.

### B. *Prong Two of the Burlington-Carter Test*

The second prong of the Burlington-Carter test asks whether "the program selected by the parent was appropriate, such that the private program meets the student's special education needs." *M.P.G.*, 2010 WL 3398256, at *2. The parents bear the burden of establishing that the placement they selected was an appropriate one. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).

The analysis a court undertakes to determine whether a private placement satisfies prong two of Burlington-Carter was explained in a Southern District opinion as follows:

> The standards for determining whether a private school placement is "appropriate" under the IDEA closely resemble, but do not mirror, the standards for assessing the adequacy and appropriateness of the proposed public placement. The Second Circuit has explained that "[s]ubject to certain limited exceptions, the same considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the appropriateness of the parents' placement." *Gagliardo*, 489 F.3d at 112 (citation omitted). "The issue turns on whether a placement –

> public or private – is reasonably calculated to enable the child to
> receive educational benefits." *Id.* (citation omitted). . . .
> Ultimately, the standard to be applied is to determine whether "[the]
> unilateral private placement . . . provides education instruction
> *specifically* designed to meet the *unique* needs of a handicapped
> child." *Gagliardo*, 489 F.3d at 115 (citation omitted).[12]

*A.D. v. Bd. of Educ. of City Sch. Dist. of City of New York*, 690 F. Supp. 2d 193, 206 (S.D.N.Y.

2010) (second ellipses in original). *See also Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356,

364-65 (2d Cir. 2006).

Here, the evidence supports a finding that S.K.'s placement at MCC was appropriate. Dr.

Jeremy Greenberg, the educational coordinator at the Manhattan Children's Center ("MCC"),

testified at the impartial hearing. IHO Hrg. Tr. 91. As Dr. Greenberg explained, MCC opened in

2007 with ten students between the ages of four and eight diagnosed with autism or pervasive

developmental disorder. *Id.* at 104, 120. The school anticipated that its enrollment would expand

to twenty-five students during the 2008-2009 school year. *Id.* at 120. Each class at MCC consists

of six students, six instructors, and one lead teacher. *Id.* at 95; IHO Decision 6. In addition, the

MCC staff included one speech therapist during the 2007-2008 school year, and a second had

been hired for 2008-2009. IHO Hrg. Tr. 97. Various ABA methodologies are used at MCC, with

a significant portion of the school day focused on speech and language development. *Id.* at 109-

11. Parents have the opportunity for training and involvement at the school. MCC encourages

parents to visit their child's classroom for observation at least weekly. *Id.* at 102. MCC staff also

---

[12] Although a court should not consider retrospective evidence of progress when
determining whether the school district's IEP is adequate on prong one, "[a] student's academic
progress in a unilateral private placement is relevant, but not dispositive, of the determination of
whether it is appropriate." *Stevens ex rel. E.L. v. New York City Dep't of Educ.*, 2010 WL
1005165, at *8 (S.D.N.Y. Mar. 18, 2010) (citing *Gagliardo*, 489 F.3d at 115). Plaintiffs, though,
have not submitted any evidence of S.K.'s progress at MCC during the 2008-2009 school year.

visit the student's home and make suggestions to parents "to carry over the procedures that we're doing in the school for generalization of skills." *Id.* at 103. MCC also holds clinical meetings with the parents every other month. *Id.* at 102. The purpose of the meetings, which include the student's lead teacher, the teacher who works directly with the student, the student's speech therapist and the student's occupational therapist, is "to collaborate and coordinate services between home and school . . . so that everybody can discuss what's working or what's not working, and to get on the same page instructionally and therapeutically." *Id.* at 102-03.

Dr. Greenberg testified that MCC was an appropriate placement for S.K. that would provide her with a meaningful educational benefit because of the school's one-to-one "plus" educational model. *Id.* at 109, 117-18. Dr. Greenberg explained that, given S.K.'s severe developmental delays, she required the intensive one-on-one instruction that MCC would provide. *Id.* at 118-19. In addition, S.K. would have the opportunity to socialize with her peers in the classroom at MCC. *Id.*

As discussed in detail above, I concluded that S.K.'s IEP failed to provide her a FAPE because it terminated her 1:1 speech and ABA therapy and failed to provide individualized training and support to her parents. The program offered at MCC provides the very services that I found lacking in S.K.'s IEP. At MCC, S.K.'s significant verbal delays would be addressed by sessions with a speech therapist and by daily focus on speech and language in a classroom setting where S.K. and her fellow students would each have their own teacher most of the day. Although Dr. Greenberg did not testify how much speech and occupational therapy S.K. would receive, MCC has adequate staff to offer these related services several times per week in a 1:1 setting. In addition, MCC offers an extended summer program to minimize regression. IHO Hrg. Tr. 98. I

therefore conclude that the program offered at MCC was "likely to produce progress, not regression," for S.K. and was, for these reasons, an appropriate placement for her.

### C. Prong III of the Burlington-Carter Test

The third and final prong of the Burlington Carter test provides that any reimbursement may be reduced or denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents."[13] 20 U.S.C. § 1412(a)(10)(C)(iii)(III). Accordingly, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant." *Forest Grove Sch. Dist. v. T.A.*, __ U.S. __, 129 S. Ct. 2484, 2496 (2009). In exercising this discretion, a court must bear in mind that the purpose of the IDEA is to provide "a *free* appropriate public education . . . designed to meet the[] unique needs" of children with disabilities. *Burlington*, 471 U.S. at 369 (emphasis added). Accordingly, the IDEA "provides for placement in private schools at *public expense*" upon a finding that an IEP failed to provide a FAPE. *Id*. (emphasis added). The Supreme Court has therefore stated that, "[i]n a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that 'appropriate' relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school." *Id.* at 370.

The Department argues that reimbursement should be denied on equitable grounds because S.K.'s parents did not cooperate with the Department and never even considered enrolling S.K. in a public school. Although courts have denied reimbursement on grounds of non-

---

[13] The IDEA also provides that reimbursement may be reduced or denied if parents fail to give the school adequate notice of their intent to enroll their child elsewhere. 20 U.S.C. § 1412(a)(10)(C)(iii). Notice is not an issue here.

cooperation, they have typically done so when parents failed to provide the school district with notice of their intent to reject a recommended placement and an opportunity for the district to propose a different one. *See M.C.*, 226 F.3d at 68 (stating that "courts have held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP"); *S.W. ex rel. M.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 364 (S.D.N.Y. 2009); *Bettinger v. New York City Bd. of Educ.*, 2007 WL 4208560, at *8 (S.D.N.Y. Nov. 20, 2007); *Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P.*, 373 F. Supp. 2d 402, 416 (S.D.N.Y. 2005).

Here, S.K.'s mother visited the Department's proposed placement in April, 2008 and met with the school's special education coordinator. SRO Decision 9. In the beginning of May, 2008, the parents signed an enrollment contract with MCC and paid a registration fee to secure a seat for S.K. for the upcoming school year. *Id.* The MCC contract permitted the parents to withdraw S.K. from MCC without financial penalty if they accepted a public school placement. Plaintiffs' Letter dated Feb. 18, 2011, Docket Entry 39, at 15. The Department notified the parents of S.K.'s recommended placement at P.S. 151 in June, 2008. SRO Decision 10. Upon receiving the final notification of placement, the parents notified the Department of their rejection of P.S. 151. In their due process demand letter, however, S.K.'s parents indicated that they were willing to meet with the Department to try to resolve the matter. Compl. Ex. C at 5.

Although they enrolled S.K. at MCC before rejecting the Department's placement, S.K.'s parents did not act so unreasonably as to warrant a denial of or reduction in reimbursement. *See R.K.*, 09-CV-4478, at *62-66 (rejecting defendant's argument that the parents failed to cooperate with the Department where the parents applied to a private school before the IEP, signed an

enrollment contract before receiving their child's public school placement, and submitted a due process complaint shortly after receiving the placement notification); *R.B. v. New York City Dep't of Educ.*, 713 F. Supp. 2d 235, 248 (S.D.N.Y. 2010). As the IHO held, "[t]he parent's refusal to send the student to the proposed placement does not demonstrate lack of cooperation or support denial of payment. . . . The parent's testimony as to the reason for her refusal was credible and[,] in view of the student's history, not unreasonable." IHO Decision 23. Accordingly, I find that the balance of equities weighs in favor of granting plaintiffs the relief they seek.

*Direct Reimbursement*

Finally, my conclusion that S.K.'s IEP did not provide her a FAPE for the 2008-2009 school year raises the issue of whether the Department may properly be ordered to pay tuition directly to MCC, despite the fact that S.K.'s parents did not pay any MCC tuition. Def. Mem. 8, Docket Entry 21; Def. Reply 11, Docket Entry 25. In a recent case of first impression, this very issue was addressed. The court held that, where the parents have prevailed on each of the three prongs of the Burlington-Carter test, the IDEA authorizes a court "to award retroactive direct payment of private school tuition." *Mr. A. ex rel. D.A. v. New York City Dep't of Educ.*, _ F. Supp. 2d _, 2011 WL 321137, at *21 (S.D.N.Y. Feb. 1, 2011). I find the thorough analysis in *Mr. A.* persuasive and therefore recommend that the Department be directed to pay MCC the full cost of tuition for the 2008-2009 school year.

### *Conclusion*

For the reasons stated above, I find that the Department failed to offer S.K. a FAPE, that MCC was an appropriate placement for S.K., and that the equities weigh in favor of granting full tuition reimbursement to the parents. I therefore respectfully recommend that plaintiffs' motion

for summary judgment be granted and that defendant's cross-motion be denied.  In addition, I recommend that the Department be ordered to pay the full cost of the tuition at MCC for the 2008-2009 school year.

Any objections to this Report and Recommendation must be filed within fourteen days of this Report and in any event no later than April 4, 2011.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).


_____/s/_____

**STEVEN M. GOLD**
**United States Magistrate Judge**


**Brooklyn, New York**
**March 17, 2011**

**Appendix A**

| | |
|---|---|
| ABA | applied behavior analysis |
| BIP | Behavior Intervention Plan |
| CPSE | Committee on Preschool Education |
| CSE | Committee on Special Education |
| FAPE | free and appropriate public education |
| FBA | Functional Behavior Assessment |
| IDEA | Individual with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* |
| IEP | Individualized Education Program |
| IHO | Impartial Hearing Officer |
| MCC | Manhattan Children's Center |
| SRO | State Review Officer |